[No. 6272–4–III.   Division Three.   July 18, 1985.]

KARAN ERDMAN, ET AL, *Respondents*, v. LOWER YAKIMA VALLEY B.P.O.E. LODGE No. 2112, *Appellant.*

*John S. Moore, Jr., Velikanje, Moore & Shore, Samuel C. Rutherford,* and *Rutherford & Wallace,* for appellant.

*Phillip Offenbacker, Daniel F. Sullivan,* and *Sullivan & Associates,* for respondents.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae.

McINTURFF, A.C.J.—This lawsuit arises out of the slip and fall by Karan "Skip" Erdman at an annual Christmas party at the Sunnyside, Washington, lodge of the defendant, the Lower Yakima Valley Lodge No. 2112 of the

B.P.O.E. (hereinafter club). The club appeals a $3.2 million jury verdict for the Erdmans, claiming errors concerning instructional rulings and the method the court used to credit the pretrial settlement dollar amount. The Erdmans challenge the judgment dismissing the children's parental consortium claims and a posttrial ruling which eliminated $1.2 million in future medical expenses. We affirm in part, but reverse that portion of the judgment setting aside future medical expenses.

On December 20, 1979, Mr. Erdman arrived at the club about 5 p.m. to assist in preparations for the party being hosted by the officers. He was a member and exalted ruler of the club. The exalted ruler, while the highest officer, was not responsible for the care and management of the facility. Rather, he served a ceremonial function, presiding over club sessions and participating in various social events. The club board of trustees, of which the exalted ruler was an ex officio, nonvoting member, exclusively controlled the management of the club. The board rarely consulted the exalted ruler and hired a manager whose duties included the day-to-day maintenance, repair and operation of the club facilities.

During the party Mr. Erdman went to the kitchen where two other members were preparing "Tom and Jerry" batter and operating the dishwasher, which was cleaning the drinking cups. Mr. Erdman was handed a tray of cups and, when turning, slipped and fell to the floor. As a result, he sustained a herniated disc in his cervical spine, which eventually required neck surgery (an anterior cervical fusion).[1] Surgery was performed without apparent complication on December 23, 1980, at St. Elizabeth's Medical Center in Yakima. But Mr. Erdman became comatose while in the post–operation recovery room. Tests later established he

---

[1]Procedurally, this surgery involves the removal of a bone plug from the vertebrae at the C–5/C–6 interspace by means of a surgical tool and replacing it with a donor plug contemporaneously removed from another area, *i.e.*, the patient's hip.

sustained hypoxic brain damage, resulting from a deprivation of oxygen to the brain.

Undisputed expert testimony documented the devastating effects of the hypoxia. Although a University of Minnesota graduate and funeral home operator, Mr. Erdman now is "very impaired and unemployable," with little chance for future improvement. He has difficulty concentrating and suffers from impaired motor activity, including speaking and general physical activity. One test evaluating brain impairment scored Mr. Erdman three standard deviations below the mean, indicating 99 people out of 100 would better perform various analytical and physical activities. These impairments have directly affected his family relationships: his husband–wife relationship is now similar to that of mother–child; his father–child relationships are more those of child–child. This injury is the basis for their lawsuit.

Mr. Erdman and his witnesses testified that before his fall, soapy fluid had accumulated on the tile floor in the kitchen area near the dishwasher. This accumulation on the tile caused slippery conditions which had existed for an extended time. A journeyman plumber employed by the club during a proposed kitchen renovation in fall 1979, noticed that a dishwasher drain pipe and water supply line leaked with each dishwasher cycle. One waitress reported that in her 2 years of employment there she fell no less than 12 times and notified all five managers about the slippery conditions. Many others testified to the unreasonably slippery conditions, which were confirmed by expert testimony: the kitchen floor had a friction co–efficient of .050, the equivalent of thawing ice, and only one–tenth of normal friction.

Mr. and Mrs. Erdman and their two children commenced separate negligence actions against the club, the surgeon, anesthesiologist, hospital and the anesthetic manufacturer in August 1981. Prior to trial, plaintiffs settled with the medical/hospital defendants pursuant to a reasonableness hearing for a total value of $815,000. The club made no objection and the court approved the settlement. The judge

also dismissed the parental consortium claims of the Erdman children, concluding no claim existed at law.

Following trial in October 1983, the jury rendered Mr. Erdman a special verdict for $3,163,834, including $1,118,834 for future medically related care and treatment. Mr. Erdman was found 25 percent comparatively negligent, and Mrs. Anicia Erdman was awarded $40,000 for her separate consortium claim.

After trial, the court granted the club's motion to set aside the award for future medical expenses because Mr. Erdman had failed to "produce substantial evidence" of the specific costs and necessity of his future medical care. The court deducted the future medically related expenses from the total verdict, and next deducted 25 percent for Mr. Erdman's comparative negligence. The court then credited the pretrial settlement amount. As this settlement required that Mr. Erdman's claim and Mrs. Erdman's consortium claim be reduced by the settlement amount, the court allocated the $815,000 between the claimants: $709,000 allocated to Mr. Erdman, $96,000 to Mrs. Erdman and $5,000 to each of the children's claims. The court made the following computations with respect to Mr. Erdman's verdict:

| | |
|---|---|
| VERDICT | $3,163,834 |
| Less award for future medical expenses | −1,118,834 |
| | $2,045,000 |
| Less 25 percent comparative negligence | −511,250 |
| | $1,533,750 |
| Less settlement | −709,000 |
| NET JUDGMENT | $824,750 |

Judgment for $824,750 was entered December 15, 1983.

### THE CLUB'S APPEAL

On appeal, the club alleges the court: (1) improperly denied its motions for summary judgment and judgment notwithstanding the verdict (n.o.v.); (2) made several instructional errors; and (3) incorrectly credited the pretrial settlement.

■ Initially, we consider whether the court erred in refusing to grant the motion for summary judgment. Summary judgment is available only where there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). The moving party must demonstrate that no genuine dispute exists as to any material fact and all reasonable inferences must be resolved against him. All evidence is considered in a light most favorable to the nonmoving party. *Lamon v. McDonnell Douglas Corp.,* 91 Wn.2d 345, 349, 588 P.2d 1346 (1979); *Mission Ins. Co. v. Guarantee Ins. Co.,* 37 Wn. App. 695, 700, 683 P.2d 215 (1984). The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Lamon,* at 349; CR 56(c).

The club's sole contention in its motion was that Mr. Erdman achieved "vice–principal" status by virtue of his club leadership position and was therefore precluded from recovery from the club. Where a servant has exclusive control of the instrumentality by which the injury is caused, the agent is precluded from claiming against the master/principal. *Bennett v. Messick,* 76 Wn.2d 474, 476, 457 P 2d 609 (1969). However, as the record discloses, this issue raised questions as to what Mr. Erdman's legal status was when he was injured, and whether the club had the right to control Mr. Erdman's physical activities when the injury occurred. Since these questions of material fact could not be resolved by summary judgment, we conclude the court properly denied the club's motion.

We next consider the club's alleged instructional errors. The club first assigns error to jury instruction 12:

> The defendant Elks Club owed a duty to the plaintiff Karan "Skip" Erdman to exercise ordinary care for his safety. This includes the exercise of ordinary care to maintain in a reasonably safe condition those portions of the premises which the plaintiff Skip Erdman was expressly or impliedly invited to use or might reasonably be expected to use under the circumstances in question.

The club presents no argument in opposition to the court's conclusion that Mr. Erdman was an invitee.[2] Rather, the club claims the court erred in failing to give its proposed "joint enterprise" instruction.[3] Restatement (Second) of Torts § 491 (1965) summarizes the club's theory:

(1) Any one of several persons engaged in a joint enterprise, such as to make each member of the group responsible for physical harm to other persons caused by the negligence of any member, is barred from recovery against such other persons by the negligence of any member of the group.

(2) Any person engaged in such a joint enterprise is not barred from recovery against the member of the group who is negligent, but is barred from recovery

---

[2]The court's conclusion is appropriate in that members of private clubs are business invitees while lawfully on the club premises. *Haugen v. Central Lutheran Church,* 58 Wn.2d 166, 169, 361 P.2d 637 (1961); *Lozan v. Fraternal Order of Eagles, Aerie 3,* 53 Wn.2d 547, 551, 335 P.2d 4 (1959); *Kalinowski v. YWCA,* 17 Wn.2d 380, 389, 135 P.2d 852 (1943). *See also Hovermale v. Berkeley Springs Moose Lodge 1483,* 271 S.E.2d 335, 338 (W. Va. 1980); *Gatti v. World Wide Health Studios of Lake Charles, Inc.,* 323 So. 2d 819, 822 (La. Ct. App. 1975); *Morrison v. New Orleans Country Club, Inc.,* 210 So. 2d 538, 541 (La. Ct. App. 1968); *Lexington Country Club v. Stevenson,* 390 S.W.2d 137, 140 (Ky. 1965); *Davis v. Springfield Lodge 158, B.P.O.E.,* 24 Ill. App. 2d 102, 164 N.E.2d 243, 248 (1960); *Blue v. St. Clair Country Club,* 7 Ill. 2d 359, 131 N.E.2d 31 (1955); *Liby v. Town Club,* 5 Ill. App. 2d 559, 126 N.E.2d 153 (1955); *see also* 62 Am. Jur. 2d *Premises Liability* § 114 (1972 & Supp. 1984) (members using club facilities are invitees). Where an invitee has been expressly or impliedly invited to a part of the premises obviously used only by the proprietor or his agents, the proprietor is held liable for injuries sustained from an unsafe condition. *See Buttnick v. J. & M., Inc.,* 186 Wash. 658, 662, 59 P.2d 750 (1936). Indeed, courts apply invitee status to those who volunteer their services and are injured while on the premises. *See Haugen,* at 168–70 (member of church congregation who volunteered services is invitee); *Kalinowski,* at 389; *see also Ward v. Thompson,* 57 Wn.2d 655, 659, 359 P.2d 143 (1961) (volunteer services at in–laws' home); *see Lozan,* at 550–52; *Morrison v. New Orleans Country Club, Inc., supra* (volunteer decorator of club dance is invitee).

[3]The club's proposed instruction reads:
"If you find that the plaintiff and other office[rs] of the defendant at the time of the accident alleged were engaged in a joint enterprise then you should return a verdict for the defendant.

"The term 'joint enterprise' means an undertaking in which the parties are associated for the mutual benefit or the pleasure of the parties for a common purpose."

against any other member of the group.

The club posits that Mr. Erdman, as exalted ruler and one involved in the management and control of the incorporated club, would have imputed to him the negligence of any other officer, which would thereby bar his recovery.

██ Jury instructions are sufficient if they "'(1) permit each party to argue his theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law.'" *Tiderman v. Fleetwood Homes*, 102 Wn.2d 334, 337–38, 684 P.2d 1302 (1984) (quoting *Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 194, 668 P.2d 571 (1983)). A court need never give an instruction erroneous in any respect. *Crossen v. Skagit Cy.*, 100 Wn.2d 355, 360, 669 P.2d 1244 (1983).

First, instruction 12 provided an opportunity for the club to argue its theory of the case. Indeed, numerous pages of the record involve the club arguing before the jury that Mr. Erdman exercised control over the party and the club, engaged in a joint enterprise, and was therefore precluded from recovering against the club. Second, the club's proposed instruction incorrectly characterized the joint enterprise rule. The instruction would have told the jury to "return a verdict for the defendant" if it were determined Mr. Erdman engaged in a joint enterprise. But as Restatement (Second) of Torts § 491, comment *k* (1965) indicates, one engaged in a joint enterprise "is *not* barred" from recovery against negligent members of the group. (Italics ours.) Since the club's negligence existed independently of Mr. Erdman's involvement and was alleged to be "a" proximate cause of Mr. Erdman's injury, the proposed instruction incorrectly stated the law and was properly denied.[4]

---

[4]At trial, the club also claimed Mr. Erdman's "vice–principal" status precluded recovery from the club. The cases indicate an *employee* is a vice–principal when in charge of the master's business, but we have found no cases defining an elected officer of a fraternal organization as an employee. The relationship of employer–employee is one of contract. *Haugen v. Central Lutheran Church*, 58 Wn.2d 166, 168, 361 P.2d 637 (1961). Here, the record shows no evidence of an employment contract; we therefore find this theory inapplicable. Moreover, the

Next, the club contends the court improperly refused to instruct on the requirement of notice of the existence of a temporary unsafe condition.[5] The club posits the slippery floor was merely a temporary condition arising the night of the party from the activities of the officers, and that notice is a requirement of liability. The court rejected the club's proposed instruction because Mr. Erdman alleged he was injured by an inherently dangerous condition, not a temporary one.

■ The requirement of actual or constructive notice applies only to temporary conditions created by others. The notice instruction is limited by its terms to those situations where there is no such participation on the part of the defendant. It does not apply where the condition was created by the landowner or his agents and had been in existence for a long time. *Falconer v. Safeway Stores, Inc.*, 49 Wn.2d 478, 303 P.2d 294 (1956); *Wardhaugh v. Weisfield's, Inc.*, 43 Wn.2d 865, 264 P.2d 870 (1953); *see also Batten v. South Seattle Water Co.*, 65 Wn.2d 547, 398 P.2d 719 (1965); *Russell v. Grandview*, 39 Wn.2d 551, 554, 236 P.2d 1061 (1951). No problem is presented concerning the notice requirement. The dangerous condition which the jury here apparently found had nothing to do with some temporary condition which might not have come to the club's attention.[6] Rather, it related to a slippery condition created by a

---

club never proposed a "vice–principal" instruction which would have put the factual aspects of that issue before the jury. Failure to request appropriate instructions is fatal to assertion of the issue on appeal. *O'Steen v. Estate of Wineberg*, 30 Wn. App. 923, 934, 640 P.2d 28 (1982) (citing *Haslund v. Seattle*, 86 Wn.2d 607, 621, 547 P.2d 1221 (1976)).

[5]The club's proposed instruction reads:
"In order to support a finding of negligence, a temporary unsafe condition of the premises which was not created by the defendant must either have been brought to the actual attention of the defendant or it must have existed for a sufficient length of time and under such circumstances that defendant should have discovered it in the exercise of reasonable care."

[6]As we must presume the jury followed the court's instructions, *Bordynoski v. Bergner*, 97 Wn.2d 335, 644 P.2d 1173 (1982), it is apparent the jury found an

combination of circumstances, all of which had been present for an extended time. Thus, we find the court properly refused the club's notice instruction.

Next, the club alleges the court erred in denying its motion for judgment n.o.v. or for a new trial. A motion for judgment n.o.v. should be granted only if the court can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict. As noted above, all evidence must be viewed in a light most favorable to the party opposing the motion. There must be substantial evidence to support the verdict.

The club contends insufficient evidence supported the jury verdict concerning the joint enterprise and vice–principal issues. But there was conflicting evidence of the control Mr. Erdman could or did exercise in the club. Some testimony indicated the board "didn't listen to the Exalted Ruler" and apparently considered him a social formality. Furthermore, the board hired a business manager who controlled the physical condition of the kitchen and directed

---

inherently dangerous condition rather than a temporary one. Instruction 2 provided in part:

The plaintiffs claim that the defendant Elks Club was negligent in failing to maintain a reasonably safe floor in the Elks Club kitchen in one or more of the following respects:

(1) The floor covering installed in the Elks Club commercial kitchen prior to December 20, 1979, was an improper type floor covering for use in a commercial kitchen and the floor covering installed in and of itself made the floor in the kitchen area *inherently unsafe for the purposes and uses intended* and to which it was actually put.

. . .

(3) The dishwasher installed in the Elks Club kitchen in the area where the plaintiff Skip Erdman fell was in and of itself defective in that it was leaky, . . . the drain and plumbing were defectively installed and maintained so as to allow water to leak onto the floor . . .

. . .

(5) That the defendant Elks Club failed to take the necessary action to correct the existing dangerous and unsafe condition of the floor in their commercial kitchen, to include repairing the dishwasher and sink, and placing safety runners and mats on the floor areas, particularly to include the areas near the dishwasher and sink.

. . .

(Italics ours.)

kitchen operations. This is enough to conclude the court properly denied the motion.

The club's final assignment of error pertains to the method the court used to credit the pretrial settlement against the jury verdict. After the jury rendered its verdicts on the separate claims of Mr. and Mrs. Erdman, the court allocated the pretrial settlement and deducted from the verdicts accordingly. Mr. Erdman's verdict was $3,163,834; the court then deducted his share of the pretrial settlement, $709,000. From Mrs. Erdman's separate consortium claim, the court also deducted $96,000, Mrs. Erdman's share of the settlement. As her settlement amount of the consortium claim for $96,000 exceeded the jury verdict of $40,000, the court entered a net judgment of "zero". The club claims this method of crediting the settlement was improper because the total $815,000 medical/hospital settlement should have been deducted from the sum of both verdicts.[7] We disagree. The settlement contract provides in part:

> It is further agreed that the total value of the settlement shall be deducted from the verdict rendered by the jury in favor of the Erdmans and against the defendant "Elks Club" with the amount distributed to Karan "Skip" *to be deducted from his verdict,* and the [sic] distributed to Anicia Erdman *to be deducted from her verdict,* and any amount awarded to the children *to be deducted from their verdict.*

---

[7]The club claims the court improperly entered its "Order Approving Reasonableness" but does not express where the court erred. Even though the club specifically assigned error to the court's entry of the order, we need not consider it because it is unsupported by argument. *Daves v. Nastos,* 39 Wn. App. 590, 595, 694 P.2d 686 (1985); *Mellor v. Chamberlin,* 34 Wn. App. 378, 383, 661 P.2d 996, *rev'd on other grounds,* 100 Wn.2d 643, 673 P.2d 610 (1983). We also note the club did not object to that portion of the settlement to which it now assigns error and is therefore precluded from raising it on appeal. *State ex rel. Partlow v. Law,* 39 Wn. App. 173, 178, 692 P.2d 863 (1984) (quoting *New Meadows Holding Co. v. Washington Water Power Co.,* 102 Wn.2d 495, 498, 687 P.2d 212 (1984)).

The club also contends the court erred in failing to credit the settlement portion relating to the children's claims. But as noted above, the settlement stipulated that the amount awarded the children be deducted from their claims, not from their parents' claims.

(Italics ours.) This manifests the parties' intent to apportion the settlement, and then reduce each separate verdict by the apportioned amount. The apportioning method also conforms with statute. RCW 4.22.060(2). Thus, we find no error.

## ERDMANS' APPEAL

We next address the Erdmans' cross appeal in which they contend: (1) the court erred in setting aside the award for future medical expenses; (2) the court improperly credited the comparative negligence finding; and (3) the court erred in dismissing the children's parental consortium claim.

■■ The Erdmans' first assignment of error pertains to whether the court erred in setting aside the award of $1,118,834 for future medical expenses. The general rule is that one may recover for future medical expenses reasonably certain to be incurred. Prior to an allowance for the cost of future medical care, evidence must indicate the care will be necessitated by the plaintiff's injury. *Leak v. United States Rubber Co.,* 9 Wn. App. 98, 103, 511 P.2d 88 (1973); *see also* Annot., *Requisite Proof To Permit Recovery for Future Medical Expenses as Item of Damages in Personal Injury Action,* 69 A.L.R.2d 1261 (1960 & Supp. 1985). Once liability for damages is established, a more liberal rule is applied when allowing assessment of the damage amount. *Moore v. Smith,* 89 Wn.2d 932, 943, 578 P.2d 26 (1978); *Larson v. Union Inv. & Loan Co.,* 168 Wash. 5, 12, 10 P.2d 557 (1932). Mathematical exactness is not required. *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 757, 649 P.2d 828 (1982); *Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.,* 66 Wn.2d 469, 476, 403 P.2d 351 (1965), *cert. denied,* 382 U.S. 1025 (1966). The court in *Leak* articulated what is necessary for a future medical expense instruction:

> This evidence was sufficient to support the instruction, [on future medical expense] because when it was shown that respondent was in need of medical attendance and had employed physicians, the presumption followed that there was some expense attached to such employment; and when it was also shown that respon-

dent would suffer in the future, it followed that in all probability he would need medical attention for which the jury were at liberty to fix a nominal sum at least. *Leak,* at 104 (quoting *Webster v. Seattle, R. & S. Ry.,* 42 Wash. 364, 365, 85 P. 2 (1906)); *see also Helman v. Sacred Heart Hosp.,* 62 Wn.2d 136, 148, 381 P.2d 605, 96 A.L.R.2d 1193 (1963); *Taylor v. Lubetich,* 2 Wn.2d 6, 97 P.2d 142 (1939).

Here, in granting the motion for judgment n.o.v., the court stated:

> [I]n arriving at that figure or, as a matter of fact, virtually any figure, the jury necessarily would have had to speculate. It would have been pure conjecture. And the court concludes that it erred in giving under the facts of this case the instruction regarding future medical expenses.

A motion for judgment n.o.v. should not be granted unless the court can say as a matter of law that there is neither evidence nor reasonable inference therefrom to sustain the verdict. *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

Significant evidence documented the medical and rehabilitative efforts Mr. Erdman had engaged in prior to trial. The record also documents his current damage: "He is like a kid"; his speech was difficult to understand, slurred, and he sounded like a drunk man; he was impaired on 61 percent of the tests, which indicates brain damage. The record documents experimental efforts may exist to improve brain function, but at present there is no recognized, effective treatment. Experts also testified Mr. Erdman would have to exercise to avoid spastic and rigid muscle conditions, his aging process would be accelerated, he would need assistance in making decisions, and in performing simple tasks, *i.e.,* dressing and eating.

Since Mr. Erdman's impairments were present at the time of trial and he had received medical attention for the impairments, there can be no doubt from the evidence that future treatment is essential for his existence; the jury was

entitled to award damages. Thus, we find the court erred in denying that portion of the verdict relating to future medically related expenses.

■ Next, the Erdmans claim the court improperly applied the pretrial settlement. They contend the percentage of contributory negligence attributable to Mr. Erdman should be deducted from the jury verdict *after* subtracting the pretrial settlement.[8] In *Scott v. Cascade Structures,* 100 Wn.2d 537, 673 P.2d 179 (1983), the court examined the language, intent and underlying policy of the tort reform act, RCW 4.22.060(2) and concluded: "[T]he proper method of calculation is to reduce the jury award by the percentage of fault attributable to the plaintiff *before* deducting the settlement award." (Italics ours.) *Scott,* at 545. The Erdmans distinguish *Scott* on the basis that it involved one injury, caused in part by the decedent's contributory negligence. They contend Mr. Erdman sustained injury from two separate incidents, the fall and the resulting surgery, but his contributory negligence applied only to the initial fall. Therefore, the argument goes, his contributory negligence should not diminish his recovery from the exacerbating injuries sustained in surgery.

The rule in *Scott* applies equally here. The two separate acts legally resulted in one indivisible injury for which the tortfeasors are jointly and severally liable. *See Lindquist v. Dengel,* 92 Wn.2d 257, 262, 595 P.2d 934, 936–37 (1979); Restatement (Second) of Torts § 457, & comment *b* (1965), for the rule that negligent medical treatment is a normal intervening cause, an incident within the scope of the risks created by the original negligent conduct. Second, Mr. Erd-

---

[8] THE TRIAL COURT'S METHOD AFTER RESTORING FUTURE MEDICAL EXPENSES

| | |
|---|---|
| VERDICT | $3,163,834 |
| Less 25% comp. neg. | 790,958 |
| ADJUSTED VERDICT | $2,372,876 |
| Less Settlement | 709,000 |
| NET VERDICT | $1,663,876 |

THE ERDMANS' PROPOSED METHOD

| | |
|---|---|
| VERDICT | $3,163,834 |
| Less Settlement | 709,000 |
| ADJUSTED VERDICT | $2,454,834 |
| Less 25% comp. neg. | 613,708 |
| NET VERDICT | $1,841,126 |

man's contributory negligence applies, depending upon which tortfeasor or tortfeasors he proceeds against. Here, he chose the club and the jury found Mr. Erdman was 25 percent at fault for the act upon which the club's liability was based. Third, RCW 4.22.060(2) provides, in part: "the claim of the releasing person [plaintiff] against other persons [jointly and severally liable tortfeasors] is reduced by the amount paid pursuant to the agreement".

Finally, Mr. Erdman should receive only that to which he is entitled. By reducing the total jury award by Mr. Erdman's negligence before deducting the settlement award, the court reduced Mr. Erdman's total damages in accordance with the jury's 25 percent contributory negligence finding. Under Mr. Erdman's method, he would obtain an unfair windfall because his percentage of fault would be 20 percent, rather than the 25 percent determined by the jury.[9] Accordingly, we conclude the court properly calculated the jury award by deducting Mr. Erdman's percentage of fault from the $3.2 million verdict before subtracting the settlement amount.

■ The Erdmans' final assignment of error questions whether the court properly dismissed the parental consortium claims of minors Nichole and Robert Erdman. On November 8, 1984, while this case was pending before this court, our Supreme Court recognized a new claim for parental consortium. *Ueland v. Pengo Hydra–Pull Corp.*, 103 Wn.2d 131, 691 P.2d 190 (1984). The court made the new rule prospective only, but made exception to the prospective effect of the rule by commencing its application with the case in which it was announced:

> We also limit this new right of action to causes of action arising on or after the date of the filing of this opinion, except that it is to be applicable in the present case.

*Ueland,* at 140–41.

Courts may overrule cases prospectively. *Linkletter v.*

---

[9]By Mr. Erdman's proposed method, he would receive $2,550,126 ($1,841,126 + $709,000), roughly 80, rather than 75, percent of the total verdict.

*Walker,* 381 U.S. 618, 627, 14 L. Ed. 2d 601, 85 S. Ct. 1731 (1965); *State ex rel. State Fin. Comm. v. Martin,* 62 Wn.2d 645, 663–73, 384 P.2d 833 (1963). When a case is overruled, a line must be drawn and, of necessity, hardships result. Here, although the Erdmans raised and diligently pursued the children's parental consortium claims from the very beginning, the court entered judgment nearly 1 year before the *Ueland* decision was issued. We also note the Supreme Court had an opportunity to consider the Erdman case with *Ueland,* but denied the Erdmans' motion to consolidate. Given the mandate of *Ueland,* we deny the parental consortium claims.

The judgment of the Superior Court is affirmed with respect to the club's assignments of error; but we reverse the court's decision with respect to future medical expenses and remand for reinstatement of the full award of those expenses.

MUNSON and THOMPSON, JJ., concur.

Reconsideration denied October 3, 1985.

Review denied by Supreme Court December 6, 1985.